## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| **JUAN DAVID CARDONA RUIZ,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CIVIL ACTION FILE** |
| | ) | **NO. 1:22-CV-2293-SDG** |
| **vs.** | ) | |
| | ) | |
| **JERISSE LOUISE AGUEY ZINSOU,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## RESPONDENT'S TRIAL BRIEF IN OPPOSITION TO PETITION FOR RETURN OF A CHILD

COMES NOW, **JERISSE LOUISE AGUEY ZINSOU**, Respondent in the above-referenced matter, by and through the undersigned counsel, and files this, Respondent's Trial Brief in Opposition to Petition for Return of a Child shows the Court the following Statement of Facts, Argument and Citation of Authorities as follows:

## STATEMENT OF FACTS

1.      Respondent was born in France.  Her mother was a French citizen, and her Father was a citizen of the United States.  She became a naturalized citizen of the United States in 1999, along with her one of my brothers.  She completed her secondary education and an associates' degree in Gwinnett County.  Respondent has

---

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 1 OF 23

maintained close relationships with many of her high school classmates, several of whom still reside in and around Gwinnett County, Georgia.

2.      Petitioner was born in Colombia and immigrated to the United States with his mother when he was in elementary school.  He never graduated high school, but he obtained his GED while incarcerated.  He remained in the United States illegally.

3.      The parties were never married but were dating when Respondent became pregnant with K.P.C. (the "Minor Child") in 2009.  The Minor Child was born in June of the following year in Gwinnett County, Georgia.

4.      There is no custody order granting Respondent legal or physical custody of the Minor Child, and Petitioner never legitimated the Minor Child.

<u>Petitioner's Criminal History</u>

5.      When the parties were celebrating Respondent's birthday party in 2011, Respondent caught Petitioner kissing one of her friends.  An argument ensued, and Petitioner pushed Respondent.  Then he attempted to punch her, but he missed. Another friend grabbed Respondent and took her home to avoid the conflict. Petitioner was very intoxicated and stayed behind.  That evening he tried to force Respondent's friend to have intercourse with him.  Petitioner was arrested and charged with sexual assault.  After a jury trial ended in a mistrial, Petitioner pled

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 2 OF 23

guilty to the charges, served four years in prison, and was deported to Colombia in 2014.

6.      That was not Petitioner's first felony conviction.  In 2006, he was convicted of drug trafficking in North Carolina and was sentenced to 25 to 30 months in prison.  He used someone else's social security number to hide is immigration status from the authorities.

### Respondent did Most if not all of the Child's Caregiving

7.      The Minor Child was eleven months old at the time of Petitioner's second incarceration and almost five years old when Petitioner was released and deported.

8.      From the time the Minor Child was born until November 2015, Petitioner was the sole caregiver and sole provider for the Minor Child.  She was solely responsible for raising him, feeding him, caring for him, taking him to the doctor, taking him to school, purchasing his clothes and toys, and engaging him in activities.

9.      When the Minor Child was young, he spoke with a stutter and had difficulties with the expression of language.  Respondent took him to speech therapy once a week, and enrolled him in public pre-K.  There he was tested for learning

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 3 OF 23

disabilities which qualified him for an IEP (independent educational plan) in school to address these issues.

10.    The Minor Child can rely on Respondent to consistently meet his needs, physically, emotionally, and developmentally.  He feels close with her, he confides in her, and he goes where she goes.

11.    Despite Petitioner's criminal history and forced relocation to Colombia, Respondent thought that prison had changed him, and felt it was best that the Minor Child get to know his father.  However, she was concerned about moving to Colombia because she did not know anyone other than Petitioner, and she did not know if she would like living there.  Petitioner convinced her to come for a visit and told her that if she moved and did not like it there, she could move back to the United States.  So Respondent visited twice: once without the Minor Child, and once with the Minor Child.  They moved to Colombia in November 2015 and lived with Petitioner.

12.    Petitioner did not change his behaviors.  He stayed out late drinking with his buddies at various bars, left Respondent alone at home with the Minor Child, and let Respondent do most of the child's care giving.  When he was present, he was controlling, demanding, crude, and disrespectful.  The parties often fought about Petitioner's drinking, flirting with women, communicating with other women on

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 4 OF 23

social media, and cheating on Respondent with other women.  At times, the fights became physical.

13.     Petitioner has a short temper and loses his patience with the Minor Child quickly. When he is mad, he screams and the Minor Child.  He would tease the Minor Child relentlessly, get frustrated with him, try to manipulate him, and expressed his disappointment when the child did not live up to his standards or expectations.  The Minor Child did not and does not want to be alone with him.

### Respondent's Half-Brother, Brendon

14.     Respondent's father and her half-brother, Brendon, also resided in Gwinnett County, Georgia.   Brendon, age 23, was diagnosed with Autism and Respondent's father was his permanent guardian until his death in 2019.  Respondent and the Minor Child were very close with Respondent's father, and both have a close relationship with Brendon.

15.     Respondent frequently travelled to the United States to visit her brother and father and to Europe to visit her mother and other family.  Whenever she went to the United States, the Minor Child would go with her.  They would stay with a friend from high school, they would get together with Respondent's other friends, and the Minor Child would play with Respondent's friends' children.

### Petitioner's Consent to the Child's Removal from Colombia

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 5 OF 23

16.     Respondent's arranged to travel to Georgia to follow up on her father's estate and to obtain guardianship of Brendon.  She purchased round trip tickets to fly to Georgia on May 28th and to fly to Colombia on June 17th.  Petitioner signed a document agreeing that Respondent could remove the child from Colombia.

17.     The parties kept in touch while Respondent and the Minor Child were in Georgia through WhatsApp and Facetime.  While in Georgia, Respondent learned that the Minor Child's friend in Colombia sent him a link to pornography.  When discussing the issue with Petitioner, the parties started fighting again.

Petitioner's Acquiesence

18.     While here, Respondent tried to communicate with a probate attorney about the guardianship proceedings and her father's estate and had trouble getting a response from her attorney.  The Probate Court also set an appointment to take the oath on June 17, 2021—the same day she had tickets to fly to Colombia.

19.     Respondent explained to Petitioner she had to extend her trip to deal with her father's estate and go to court.  However, the parties were also fighting at the time, and Respondent felt like Petitioner was trying to control her.  She knew if she returned to Colombia she would have to come right back to the United States again to address her father's estate issues.  She also knew that the Minor Child did not want to go to Colombia or stay in Colombia without his mother.  Therefore, she

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG

PAGE 6 OF 23

told Petitioner that if he wanted her to return immediately, he would need to give her something that would allow her to leave again with the Minor Child.

20.     Meanwhile, Brendon became unruly (which happens often) and was kicked out of his group home.  As his guardian, Respondent had to stay to find him a new place to live.  Petitioner understood and agreed she should address Brendon's needs.

21.     The parties then agreed to attend couples' counseling online to work on their relationship.  In counseling, they worked on communication issues and where they should go from there.  In Respondent's one on one session with the counselor, she discussed the fact that when she was away from Petitioner, she could see how controlling he could be, how absent he was from the home, and how unhappy she was in Colombia.  She could not trust Petitioner because he would lie to her, and it was unlikely that he would change.  Petitioner continued to party and follow women on social media, he kept demanding that she tell him what she was doing and who she was with, he kept asking the Minor Child about Respondent's activities, and he eavesdropped on Respondent's conversation under the guise of playing a video game with the Minor Child.

22.     The parties discussed enrolling the Minor Child in public school in Gwinnett County.  In order to do so, Petitioner had to officially withdraw the Minor

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG

PAGE 7 OF 23

Child from school in Colombia.  The child had been attending school virtually. He told Petitioner that he was going to tell his classmates that he was withdrawing from school, and Petitioner confirmed that he was going to officially withdraw him.

23.    The child started sixth grade in Twin Rivers Middle School in Buford on August 2, 2021, and continued to attend school there with his friends for the whole 2021-2022 school year.

<u>The Child's Objection</u>

24.    Respondent came to the conclusion she did not like living in Colombia with Petitioner in the September/October 2021 time frame.  They were always fighting and she did not like who she was when she was with him.  When Petitioner realized that their relationship was over in October 2021, Petitioner suggested that the three of them, Petitioner, Respondent and the Minor Child speak on a video call about how they got to where they were.  Petitioner told Respondent that they would ask the Minor Child what he wanted to do, and *that they would respect the child's decision*.  They got on that call, and the Minor Child said that he wanted to stay with his mother in the United States.   Petitioner snapped, and told the Minor Child that his mom doesn't want the family to be together, that she does nothing for the family, and that she was trying to keep the child away from him.

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 8 OF 23

25.     After things cooled off a bit, Petitioner told Respondent that even if she wanted to stay in the United States with the child, he wanted the child to visit with Petitioner during his school breaks in November and December, that it should be put in writing, and that he would have his attorney send the paperwork.   Respondent agreed.

26.     By then, the Minor Child's passport expired.   Respondent researched how to have it renewed.  Insofar as Petitioner was unable to authorize the renewal in person, he would have to sign an authorization before a notary and send it with a copy of his identification; however, he refused to sign any document.

27.     No paperwork ever came.   The first time Respondent learned that Petitioner wanted the child to return to Colombia on a permanent basis was when she was served with the petition in this case, which had been filed on June 9, 2022.

28.     Respondent filed a paternity and custody case against Petitioner in Gwinnett County Superior Court on or about July 12, 2022, which is currently pending so that the parties can work out a visitation schedule for the child.

<u>Communication with the Child</u>

29.     Since the child had arrived in the United States in May, his father would text him and call him very frequently.   Often, he would call or text while the child was in a class or away from his phone.  If the child did not respond right away,

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 9 OF 23

Petitioner would keep texting, tell Respondent, and demanded a response and pictures. He asked the child why he never texted him first? The child would respond when he was available. He sent pictures and videos, they played video games together, did homework together, and were regularly communicating with each other.

30.     After that telephone call in October, the Minor Child stopped speaking with the Petitioner. He was afraid he made his father angry and did not want to listen to him disparage his mother. Respondent kept encouraging the child to text and call his father, but he refused. She finally got him to call his father on his birthday.

31.     The child does not want to go to Colombia. He enjoys being with his life-long friends and attending school with them. He generally does very well in school here. He does not like it when his father yells at him. It scares him. He worries about his safety in Colombia, and feels safer here. He is an American and wants to live with his Mother *as always*. He is now in the seventh grade and is looking forward to continuing the school year in the United States.

32.     The State Department has issued a "Level 3" travel advisory with regards to Colombia and a "Level 4" travel advisory with respect to Arauca, Cauca

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 10 OF 23

(except Popayan), and Norte de Santander departments due to crime and terrorism.[1] The Colombia Travel Advisory advises that "Violent crime, such as homicide, assault, and armed robbery, is widespread. Organized criminal activities, such as extortion, robbery, and kidnapping, are common in some areas." Id.

33.    Further, Respondent and the child witnessed and learned about extortion, robbery, and theft in and around where they used to live in Colombia.

## ARGUMENT

34.    Children who are wrongfully removed or retained "are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). Several of the exceptions apply to this case.

35.    The Court should not order the return of the child pursuant to the Hague Convention because (1) the removal was not wrongful, (2) the retention was not wrongful, (3) Petitioner waited too long to file this action, (4) Petitioner consented to and acquiesced to the child remaining in the United States, and (5) the child objects to being returned.

36.    The Convention on Civil Aspects of International Child Abduction ["Hague Convention"] was adopted by the signatory nations in order "to protect

---

[1] Colombia Travel Advisory (state.gov)

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005
*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG
PAGE 11 OF 23

children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention Preamble.  A copy of the Hague Convention is attached hereto as Exhibit D-1.   The United States ratified the Convention on April 29, 1988.

37.     Under the International Child Abduction Remedies Act [ICARA] at 22 U.S.C. 9001 *et seq*., Petitioner has the burden of showing by a preponderance of the evidence that the retention was wrongful.  22 U.S.C. §9003(e)(1).  If Petitioner meets his burden, then the burden shifts to Respondent to show 1) by clear and convincing evidence that there is a grave risk that the return of the children would expose the children to physical or psychological harm, Hague Convention, Article 13b, 22 U.S.C. §9003(e)(2)(A); 2) by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," Hague Convention, Article 20, 22 U.S.C. §9003(e)(2)(A); 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment, Hague Convention, Article 12, 22 U.S.C. §9003(e)(2)(B); or 4) by a preponderance of the evidence that Petitioner was not actually exercising his custody rights at the time of removal or

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG

PAGE 12 OF 23

retention, or had consented to or subsequently acquiesced in the removal or retention, Hague Convention, Article 13a, 22 U.S.C. §9003(e)(2)(B).

I.     The Removal was Not Wrongful Because Petitioner Consented to It.

The Petition should be denied because the removal of the child was not "wrongful" as defined by the Hague Convention. Article 3 of the Hague Convention provides that the removal or the retention of a child is wrongful where –

> *a*     it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> *b*     at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

(Exhibit D-1)

38.     Respondent did not breach any custodial rights that Petitioner may have. She did not abduct or abscond with the child. When she took the child with her to the United States, she followed the laws in Colombia, and had the authorization from Petitioner as required. She was honest with Petitioner regarding

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 13 OF 23

her trip and the purposes for the trip.  She regularly communicated with Petitioner, and Petitioner signed the necessary documents to permit Respondent to leave the country with the child.  Because the removal was not wrongful, the Court should dismiss the Petition.

      II.    <u>The Petition Should be Dismissed because Respondent's Retention of the Minor Child was not Wrongful.</u>

39.    Respondent's retention of the Minor Child was not wrongful because by the time the Petitioner filed this action, the child's habitual residence changed to the United States.  "Although the Hague Convention concerns children who have been wrongfully removed or retained from their country of habitual residence, neither the Convention nor ICARA defines habitual residence. In *[Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)]*, we cited approvingly one characterization of the phrase as requiring "that the purpose of living where one does has a sufficient degree of continuity to be properly described as *settled*." 392 F.3d at 1252 (emphasis added and citations omitted).  <u>Calixto v. Lesmes</u>, 909 F.3d 1082, 1084 (11th Cir. 2018).  <u>See also</u> <u>Blackledge v. Blackledge</u>, 866 F.3d 169 (3rd Cir. 2017).

40.    "In *Ruiz*, as here, we were concerned with how and when a child's habitual residence might change from one country to another, not with how an initial habitual residence comes to be in the first place. To that end, we decided to follow

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005
PAGE 14 OF 23

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

and adopt the reasoning of the Ninth Circuit in *Mozes v. Mozes* , 239 F.3d 1067 (9th Cir. 2001), and held that "[t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Ruiz* , 392 F.3d at 1252 (citation omitted). "[T]he relevant intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id.* at 1253 (citations and internal quotation marks omitted). "This settled intention is crucial because there can be no bright line rule with respect to the length of an absence," and we must therefore "pay close attention to subjective intent." *Id.* (citations and internal quotation marks omitted)." <u>Id.</u>

41.     "In analyzing whether a child's habitual residence has changed, a court must first determine whether the parents or guardians (i.e., the persons entitled to fix the place of the child's residence) shared an intent to change the child's habitual residence. *See id*. The "unilateral intent of a single parent" will not suffice to change a child's habitual residence. *See Redmond v. Redmond*, 724 F.3d 729, 745 (7th Cir. 2013) (citing *Mozes*, 239 F.3d at 1075–77 ). <u>Id.</u>

42.     "Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence." *Ruiz*, 392 F.3d at 1253. There must also be "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Id.* (citing *Mozes*, 239 F.3d at 1078 ).

3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 15 OF 23

The evidence required to show acclimatization becomes greater if there was no shared settled intent of the parents to change a habitual residence. *See Chafin*, 742 F.3d at 938 ("[A]fter an initial finding that parents lack a settled intent to abandon their child's prior habitual residence for a new one, the burden on the party asserting a change in habitual residence increases.") (citation omitted). Id.

43.     Further, the parties agreed that, based on the child's preference to remain with his mother, the child's residence would change, and he could visit his father on breaks.   Therefore, when the parties agreed that the child would stay with Respondent in the United States in October 2021, the child's habitual residence changed to the United States and the state of Georgia.

44.     It is the law of Georgia that "[o]nly the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child as provided in Code Section 19-7-22. Otherwise, the mother may exercise all parental power over the child." O.C.G.A. § 19-7-25.   Therefore, once the child's habitual residence changed back to Georgia, Petitioner had no custodial rights to breach when Respondent retained the child in the United States.

45.     Because the child's habitual residence changed as of October 2021, any retention of the child after that date is not wrongful because Respondent did not breach any of Petitioner's custodial rights under the law of the child's habitual

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 16 OF 23

residence.  Therefore, the Petition should be dismissed.

III.    <u>The Petition should be Denied because it was Filed More Than One
Year after the Alleged Wrongful Removal and the Child is Now Settled
in His New Environment</u>.

46.    Article 12 of the Hague Convention requires that the judicial
proceedings commence before one year has expired after the alleged wrongful
removal.  It states the following:

> Where a child has been wrongfully removed or retained in terms of
> Article 3 and, at the date of the commencement of the proceedings
> before the judicial or administrative authority of the Contracting State
> where the child is, a period of less than one year has elapsed from the
> date of the wrongful removal or retention, the authority concerned shall
> order the return of the child forthwith.

> The judicial or administrative authority, even where the proceedings
> have been commenced after the expiration of the period of one year
> referred to in the preceding paragraph, shall also order the return of the
> child, unless it is demonstrated that the child is now settled in its new
> environment.

(Exhibit D-1).

47.    Plaintiff contends that the child was wrongfully removed from

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 17 OF 23

Colombia on May 28, 2022, the day she travelled to the United States.  Petitioner did not file this action until June 9, 2022, which is more than one year.

48.    The child is now settled in the United States. The child has been residing in the United States since May 28, 2021, and he is "now settled" in Gwinnett County, Georgia.  He has life-long friends here, he attends school here, and he has good relationships with his teachers.  His Uncle Brendon is also here, and he enjoys spending time with him.  He has many memories that were established from the time he was born.  He has spent more than half of his life in the United States.

49.    Because it has been more than a year since the alleged wrongful removal and the child is now settled in Georgia, the Petition should be dismissed.

IV.    <u>The Petition should be Denied because Petitioner Consented to and Acquiesced to the Child Remaining in the United States.</u>

50.    The parties agreed in their conversation in October 2021 that the child could remain in the United States and visit Petitioner during his school breaks. Article 13(a) of the Hague convention states that the court is not bound to order the return of the child if the person establishes that the person had consented to or subsequently acquiesced in the removal or retention. (Exhibit D-1).

51.    Although Respondent first intended to go to the United States for a vacation, the circumstances changed.  The parties fought, they tried to work out their

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005
PAGE 18 OF 23

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

differences, and they decided to move one.  The Hague Convention accommodates such circumstances where the left behind parent acquiesces to the circumstances as they unfold.

52.     Petitioner acquiesced to Respondent remaining in the United States to take care of her father's estate and her half-brother.  He acquiesced when he withdrew the child from his school in Colombia and made no protest to his change of schools.  He acquiesced when he spoke to the child, who told him that he wanted to stay with Respondent in the United States, and he consented to the child remaining in the United States on a permanent basis when he told Respondent that he would want to visit.  Therefore, the Petition should be denied.

V.     <u>The Petition should be Denied because the Child Objects to Being Returned.</u>

53.     The Minor Child is of sufficient age and maturity and objects to being returned to Colombia.  "One of the primary areas in which a court may appropriately decide not to return a child occurs when a child of sufficient age and maturity objects to being returned to the country of habitual residence. The Convention provides in Article 13: 'The judicial or administrative authority *may* also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 19 OF 23

(emphasis added)." <u>De Silva v. Pitts</u>, 481 F.3d 1279, 1286 (10th Cir. 2007). <u>See also</u>,

<u>Dias Arboleda v. Arenas</u>, 211 F.Supp.2d 336 (E.D.N.Y. 2004)(child's wishes not to

return to Colombia were respected); <u>Laguna v. Avila</u>, No. 07-CV5136, 2008 WL

1986253 (E.D.N.Y. 2008)(denying Hague Convention petition where 13 year old

objected to returning to Colombia with his father because he had more friends and

better opportunities in the United States); <u>Castillo v. Castillo</u>, 597 F.Supp. 2d 432

(D. Del. 2009)(Eleven year old child desire not to return to Colombia and own

concern for her safety there played a factor in deciding her level of maturity and

understanding of the situation).

  54. [T]he Convention also provides that the child's views concerning

the essential question of its return or retention may be conclusive,

provided it has, according to the competent authorities, attained an age

and degree of maturity sufficient for its views to be taken into account.

In this way, the Convention gives children the possibility of interpreting

their own interests. Of course, this provision could prove dangerous if

it were applied by means of the direct questioning of young people who

may admittedly have a clear grasp of the situation but who may also

suffer serious psychological harm if they think they are being forced to

choose between two parents. However, such a provision is absolutely

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
<u>Ruiz v. Zinsou</u>
Case No.22-CV-2293-SDG

PAGE 20 OF 23

necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

Id.  "The Convention contains no age limit for applying the exception, and if a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account."  Id. (Cits. omitted.)

55.    In De Silva v. Pitts, *supra*, the magistrate judge interviewed a 13 year old boy "*in camera* with her law clerk and the court reporter present, but without the parents or their counsel in attendance.  The boy explained that he "gets along with his sister who lives there, he had also made friends in Ardmore where he is on the football team and the wrestling team."  De Silva, at 1287. He liked the school better and felt more at home in Oklahoma. The magistrate judge found that he was a "bright, expressive child with a well-developed understanding of his situation and

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
Ruiz v. Zinsou
Case No.22-CV-2293-SDG

PAGE 21 OF 23

the positions of his parents."  The court did not find him to be swayed by gifts or influenced by his father.  He enjoyed his friends, activities, and friends.  "He is well-settled in his environment in Oklahoma and expressed his desire to remain in Oklahoma" with his father. The court further found that "[a]llowing him to remain with [his father] while an Oklahoma court determines custodial issues between his parents is in his best interests at this time."  The 10th Circuit Court of Appeals affirmed giving deference to the court's findings based on the magistrate judge's opportunity to observe the child in person.  Id.  It further held that "[g]iven the court's duty to consider [the child's] best interests and to determine whether he was of sufficient age and maturity to weigh in on the matter, we find no error in the district court's ultimate conclusion that [the child] should remain in Oklahoma while Oklahoma courts decide the custody matter." Id. at 1288.

56.    The Minor Child's honest wishes is to remain with his mother in the United States. He considers the United States to be his home.  This is where he was born and raised for the first five years of his life.  He has family and friends here. He feels safe here, and this is where his mother lives.  Therefore, the court should consider the Minor Child's wishes, deny the Petition and allow the Gwinnett County Superior Court to decide the custody issues.

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG

PAGE 22 OF 23

## CONCLUSION

For the foregoing reasons, the Petition should be dismissed and or/denied.

Respectfully submitted, this the 17th day of August, 2022.

FAULHABER FAMILY LAW, LLC


/s/Tamar Faulhaber
Tamar Faulhaber
Georgia Bar No. 256195
*Attorney for Respondent*

3180 North Point Parkway
Building 100, Suite 103
Alpharetta, GA 30005
(770) 408-1025/ FAX (866) 725-5877
Tamar@TFamilyLaw.com

FAULHABER FAMILY LAW, LLC
3180 NORTH POINT PARKWAY
BUILDING 100, SUITE 103
ALPHARETTA, GEORGIA 30005

*Respondent's Answer*
*Ruiz v. Zinsou*
Case No.22-CV-2293-SDG

PAGE 23 OF 23